## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____ :

**UNITED STATES SECURITIES AND** :
**EXCHANGE COMMISSION** :
  :
     **Plaintiff,** :
  :
     **vs.** :      **Civil Action No.**
  :
**DAVID B. BLASZCZAK** :
**CHRISTOPHER M. WORRALL** :
**THEODORE J. HUBER** :
**JORDAN B. FOGEL,** :      **Jury Trial Demanded**
  :
     **Defendants.** :
  :
_____ :


## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants David B. Blaszczak ("Blaszczak"),  Christopher M. Worrall ("Worrall"), Theodore J. Huber ("Huber"), and Jordan B. Fogel ("Fogel") alleges as follows:

### SUMMARY

1.    This is an insider trading case involving Christopher Worrall, a federal government employee who breached his duties of trust and confidence by illegally disclosing highly confidential and material information concerning the internal deliberations and planned actions of the agency for which he worked.  The actions of that agency can significantly impact the finances and stock prices of certain companies in the healthcare industry.  Worrall made those illegal tips to his friend, David Blaszczak, who worked as a consultant in the so-called

1

"political intelligence" industry.  Blaszczak in turn tipped Theodore Huber and Jordan Fogel, who were analysts at one of Blaszczak's clients, an investment adviser firm in the healthcare field ("Adviser A").  Huber and Fogel then used the information as the basis for advantageous trades in healthcare companies that would be affected by the agency's actions.  By buying or selling securities of those companies before the agency announced its plans to the public, Adviser A reaped millions of dollars in ill-gotten gains in the form of trading profits for several hedge fund clients it advised, as well as management fees and performance-based compensation for the adviser.

2.      From at least May 2012 and continuing through November 2013 (the "Relevant Period"), Worrall, a senior staff member at the Centers for Medicare & Medicaid Services ("CMS"), worked in the Office of the Director for the Center for Medicare ("CM"), the CMS component that sets Medicare reimbursement rates.  By virtue of his position in the CM Director's Office and other job responsibilities, Worrall obtained material, nonpublic information about CMS's reimbursement rate decisions before the agency released its decisions to the public. In breach of Worrall's duty to maintain the confidentiality of such information, Worrall communicated specific, material, nonpublic information regarding the rate changes to his close friend and former colleague, Blaszczak, through text messages, telephone calls, and in-person meetings, including meetings at CMS.  Blaszczak worked at a series of Washington, D.C.-based consulting firms that specialize in providing "political intelligence."  In each instance, Blaszczak provided the material, nonpublic information obtained from Worrall to Huber and/or Fogel, analysts at Adviser A, which was one of Blaszczak's clients.  Fogel and Huber then caused Adviser A to place trades on behalf of certain hedge funds based on this information, yielding over $3.9 million in illegal profits.

2

3.      Blaszczak knew, should have known, or consciously avoided knowing that the information he received from Worrall was material and nonpublic and that Worrall tipped him in breach of a duty.  Indeed, Blaszczak bragged to others about his access to information from inside CMS.  For example, Blaszczak told Fogel in an email that another analyst's predictions differed from Blaszczak's because his competitor "doesn't know anyone at cms.  His guesses are just wild random guesses."

4.      Shortly after Worrall and Blaszczak communicated, Blaszczak communicated with Huber and/or Fogel by telephone and email.  Within days, and sometimes within minutes, of these communications, Adviser A began trading securities on behalf of one or more funds it managed in companies that would be affected by the rate-setting rules.  Huber and Fogel knew, should have known, or consciously avoided knowing that they were receiving information that was communicated in breach of a duty.  They knew that Blaszczak had a source within CMS and even encouraged him to develop additional sources within CMS.  And they knew that Blaszczak had repeatedly provided them with specific, accurate information about upcoming rate changes that other analysts did not have and that Adviser A paid Blaszczak's firms for this information.  Adviser A paid Blaszczak's firms, collectively, at least $193,000 for his information during the Relevant Period.

5.      Worrall tipped Blaszczak because of their close personal friendship and in exchange for past and potential future pecuniary gain, including through employment or business opportunities, which were financially valuable to Worrall.  For example, in September 2011, shortly before the first trading event discussed below, Blaszczak introduced Worrall to a contact at a healthcare policy firm who interviewed Worrall for a job in the private sector.  Worrall did not take the job, but he used the opportunity to leverage a promotion at CMS in December 2012

that included a $10,000 raise and new supervisory responsibilities.

6.     Huber and Fogel knew, should have known, or consciously avoided knowing that Blaszczak's source was a CMS insider who provided the tips in exchange for a benefit.  Huber and Fogel pressed Blaszczak to get material, nonpublic information regarding CMS decisions, including those at issue here, and Blaszczak repeatedly provided Huber and Fogel with specific information about internal CMS decision-making.  Huber and Fogel were sophisticated market professionals who knew, should have known or consciously avoided knowing that it was unlawful for government employees, including someone at CMS, to disclose material, nonpublic information and, thus, that such an employee would only do so for a benefit.  Huber and Fogel also knew, should have known, or consciously avoided knowing that Blaszczak was a former CMS employee who remained friends with CMS employees.

7.     Over the course of more than one and a half years, this insider trading scheme involved at least three CMS announcements and trades in at least four issuers' securities and yielded over $3.9 million in illegal profits to Adviser A-managed hedge funds.  Upon information and belief, Fogel and Huber received compensation from Adviser A based in part on performance driven by the profits garnered through this insider trading scheme.  Blaszczak's firms received and renewed contracts, as well as bonuses, from Adviser A that also were driven by the profits generated by this scheme.  Upon information and belief, Blaszczak's compensation was based on the fees and bonuses that he generated from clients, including Adviser A.

8.     By engaging in the conduct described in this Complaint, Blaszczak, Worrall, Huber, and Fogel violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 [*17 C.F.R. § 240.10b-5*] thereunder and Section 17(a)(1) of the Securities Act of 1933

("Securities Act") [*15 U.S.C.  § 77q(a)(1)*].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

9.      The Commission brings this action against Blaszczak, Worrall, Huber, and Fogel

pursuant to Section 21A of the Exchange Act [*15 U.S.C. § 78u-l*] to enjoin the transactions, acts,

practices, and courses of business alleged in this Complaint and to seek orders of disgorgement,

along with prejudgment interest, civil penalties, and such further relief that the Court may deem

appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a)

of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*], and Sections 21(d), 21(e), 21A, and 27 of

the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*].

11.      Venue in this district is proper under Section 22(a) of the Securities Act [*15U.S.C.

§ 77v(a)*], and Section 27 of the Exchange Act [*15 U.S.C. § 78aa*].  During the Relevant Period,

Huber and Fogel worked in New York, New York at Adviser A's headquarters, Blaszczak

traveled to New York, New York to meet with Huber and Fogel, and certain of the acts,

practices, transactions, and courses of business constituting the violations alleged in this

Complaint occurred within the Southern District of New York, and were effected, directly or

indirectly, by making use of the means, instruments or instrumentalities of transportation or

communication in interstate commerce, or of the mails, or the facilities of national securities

exchanges.

## THE DEFENDANTS

12.      **Defendant David B. Blaszczak**, age 41, was a resident of Arlington, Virginia

during much of the relevant period.  He currently resides in Isle of Palms, South Carolina.

Blaszczak worked at CMS from 2000 through 2005.  He served as a health insurance specialist and, ultimately, as a special assistant to the CMS Administrator.  He then joined a series of consulting firms specializing in healthcare policy issues, including Potomac Research Group Holdings, LLC; HillCo Health, LLC; ADVI Health, LLC; and finally, Precipio Health Strategies, LLC, which he co-founded in September 2014.  He previously held a Series 7 securities license, which has lapsed.

13.     **Defendant Christopher M. Worrall**, age 39, is a resident of Linthicum Heights, Maryland and an executive branch employee. Worrall has been employed at CMS since at least July 1999. Worrall has worked in the Director's Office in the Center for Medicare, a CMS component, since at least November 2010.  Worrall currently serves as a Health Insurance Specialist in the Office of the Administrator in the Center for Medicare.

14.     **Defendant Theodore J. Huber,** age 55**,** is a resident of Westport, Connecticut. Huber has worked at Adviser A since October 2005.  During the Relevant Period, he served as a healthcare analyst covering the medical devices sector for Adviser A.  He previously held Series 7, 63, 86, and 87 securities licenses, which have lapsed.

15.     **Defendant Jordan B. Fogel,** age 33, is a resident of Port Washington, New York. Fogel worked at Adviser A from approximately 2006 through mid-2016.  During the Relevant Period, he served as a healthcare analyst covering the medical devices and services and information technology sectors for Adviser A.  He previously held Series 7, 63, 86, and 87 securities licenses, which have lapsed.

## OTHER RELEVANT ENTITITES

16.     **Adviser A**, Adviser A is a registered investment adviser that provides advisory services exclusively to its three associated hedge funds, referred to herein as Hedge Fund 1,

Hedge Fund 2, and Hedge Fund 3 (collectively the "Hedge Funds").

17. **The Centers for Medicare & Medicaid Services**, which is headquartered in Baltimore, Maryland, is part of the United States Department of Health and Human Services, a federal agency.  The Center for Medicare is the component of CMS that administers Medicare's national payment systems and determines the reimbursement rates Medicare makes to healthcare providers for various treatments.

18. **Potomac Research Group Holdings, LLC ("Potomac Research")**, was a privately-held Delaware limited liability corporation and investment adviser headquartered in and registered with the District of Columbia.  It provided policy analysis to institutional clients with a focus on healthcare, financial services, telecommunications, and defense.  Blaszczak worked at Potomac Research as a senior health policy analyst from September 2009 until December 2012.

19. **HillCo Health, LLC ("HillCo")**, a Delaware limited liability corporation with offices in Washington, D.C., was a consulting firm focused primarily on healthcare financing and policy making process.  HillCo's services included advising clients on issues related to coverage, coding, and reimbursement of healthcare products and services in the private and public sectors.  In August 2013, HillCo completed a restructuring and changed its name to ADVI Health, LLC.  Blaszczak worked at HillCo as a partner from January 2013 until August 2013, when HillCo changed its name to ADVI.  During at least part of this time period, Blaszczak also was HillCo's Chief Compliance Officer.

20. **ADVI Health, LLC ("ADVI")**, a Delaware limited liability corporation, was formed in July 2013 through a merger of HillCo and another firm.  In 2013, an affiliate of ADVI was registered with the District of Columbia as an investment adviser.  ADVI, which has offices

in, among other places, Washington, D.C., is a healthcare advisory firm that provides clients with services including, "predictive analysis on legislation and regulation and its impact to particular healthcare services or products." Blaszczak worked at ADVI as a partner and senior vice-president from August 2013 until August 2014.

21.     **Precipio Health Strategies, LLC ("Precipio")**, a Delaware limited liability corporation headquartered in Washington, D.C., provides healthcare advisory and consulting services and represents that its expertise "spans the entire spectrum of government and industry entities, including CMS, HHS, commercial payers, Medicaid, FDA, Medicare contractors, [the Pharmaceutical Research and Manufacturers of America], hospital systems, healthcare industry firms and the [American Medical Association]." Blaszczak co-founded Precipio in September 2014. At that time, ADVI assigned its interests in its affiliate (which was registered with the District of Columbia as an investment adviser) to Precipio.

## RELEVANT ISSUERS AND ANNOUNCEMENTS

22.     **DaVita Healthcare Partners, Inc. ("DVA")** is a Delaware corporation headquartered in Denver, Colorado. At all relevant times, DVA's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NYSE. DVA's largest line of business focuses on kidney dialysis and related laboratory services. On November 22, 2013, CMS announced a final rule phasing in a 12% reimbursement cut (pursuant to a July 1, 2013 proposed rule) for certain end-stage renal disease treatments. Both the proposed and final rules affected products and services offered by DVA and its stock price.

23.     **Elekta AB ("EKTAB")** is a Swedish corporation headquartered in Stockholm, Sweden. EKTAB's common stock is not registered with the Commission as its ordinary shares trade on the Stockholm Exchange. The company develops and sells clinical products and services for the treatment of cancer. On July 6, 2012, CMS announced a proposed rule reducing

8

the reimbursement amount for certain radiation oncology treatments, which affected products and services offered by EKTAB and its stock price.

24.    **Fresenius Medical Care AG & Co. KGaA ("FMS")** is a German company headquartered in Bad Homburg.  At all relevant times, FMS's ADR was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NYSE.  In addition, FMS's common stock traded in Germany.  The company is the world's largest provider of kidney dialysis care, services, and products.  On July 1, 2013, CMS announced a proposed rule that would reduce the reimbursement amount for certain end-stage renal disease treatments by 12%, which affected products and services offered by FMS and its stock price.

25.    **Varian Medical Systems ("VAR")** is a Delaware corporation headquartered in Palo Alto, California.  At all relevant times, VAR's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NYSE.  VAR manufactures medical devices and software for treating cancer, including radiation technology. On July 6, 2012, CMS announced a preliminary rule reducing the reimbursement rate for certain radiation oncology treatments, which affected products and services offered by VAR and its stock price.

## STATEMENT OF FACTS

### CMS's Rate-Changing Process

26.    The Center for Medicare at CMS is headed by a Director and two Deputy Directors.  CM administers the national payment systems that determine Medicare reimbursement rates — the amount of money a medical provider or supplier will receive from Medicare to provide a given medical service or product.  The national payment systems include the prospective payment systems ("PPSs"), which set fixed reimbursement amounts for medical

services and various fee schedules for physician, clinical laboratory, ambulance, and ambulatory surgical services.

27.     Each year, CMS issues proposed and final rules setting Medicare reimbursement rates for the following calendar year.  These CMS releases often impact the stock prices of companies that offer products and services covered by the affected PPSs and fee schedules.  For this reason, CMS discloses the releases after market close.

**Worrall's Position and Access to Material, Nonpublic Information**

28.     In his capacity as a special assistant and technical advisor reporting to the CM Director and one of the two Deputy Directors, Worrall had access to material, nonpublic CMS decisions concerning reimbursement amounts under the PPS and fee schedule rules, including information contained in confidential briefing papers and meetings where reimbursement proposals were discussed.

29.     During the Relevant Period, Worrall directed CM's monitoring of key aspects of its payment programs through his role as project manager for an internal data system.  This system, referred to by Blaszczak as a "real time database" in communications with certain clients, contains substantial medical and patient data that CMS uses to, among other things, monitor claims filed on behalf of patients undergoing treatment for end stage renal disease ("ESRD").

**Worrall Breached His Duties Not to Disclose Nonpublic Information**

30.     Worrall knew or was reckless in not knowing that he was not permitted to disclose to others nonpublic information he accessed in the course of his employment.  Worrall also knew or was reckless in not knowing that the person to whom he provided the information would trade, or would cause others to trade, on the basis of the material, nonpublic information.

31.     As an employee of CMS, Worrall was subject to Section 21A(h) of the Exchange

Act, added by the Stop Trading on Congressional Knowledge Act of 2012 (or "STOCK Act"), P.L. 112-105, effective April 4, 2012, which provides that "each executive branch employee . . . owes a duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from such person's position."  15 U.S.C. § 78u-1(h).

32.     In addition, CMS's Employee Nondisclosure Policy, which Worrall received on several occasions prior to and during the Relevant Period, prohibited Worrall from disclosing "nonpublic, confidential, privileged, or proprietary" information "except as authorized by law." The policy explained that "nonpublic information" is information that an employee gains by reason of his or her federal employment and that he or she knows or reasonably should know is not available to the general public.  Moreover, this policy warned Worrall that some of this information "may be 'market sensitive' information, meaning that its disclosure may have stock or bond market implications" and that he may not use confidential or nonpublic information to "give investment 'tips' to others (i.e., 'insider trading')."

33.     Worrall also was subject to the *Standards of Ethical Conduct for Employees of the Executive Branch*.  Those standards provide that,  "An employee shall not engage in a financial transaction using nonpublic information, nor allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure."  5 C.F.R. § 2635.703(a).  This standard is based on the general principle that "[p]ublic service is a public trust.  Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain."  5 C.F.R. § 2635.101(a).

34.     By virtue of his employment at CMS, Worrall had access to highly confidential

information related to pending CMS announcements, including each of the announcements described below.  News of the announcements, when disclosed, had a material impact on the stock prices and/or trading volume of the securities of public companies affected by the changes announced by CMS.

35.     From at least May 2012 and continuing through November 2013, Worrall breached his duties of trust and confidence by disclosing CMS's material, nonpublic information for the purpose of reaping personal benefit and benefiting Blaszczak in at least three instances, as detailed below.

36.     Worrall knew or was reckless in not knowing that he was violating duties he owed to CMS and as an employee of the executive branch.  In each instance, Worrall violated his duties when he knowingly or recklessly passed to Blaszczak confidential information regarding pending, nonpublic CMS announcements.  Based on Worrall's interactions with Blaszczak, Worrall knew or was reckless in not knowing that his communications with Blaszczak would lead to purchases or sales of securities by others.  Indeed, prior to the Relevant Period, Blaszczak introduced Worrall to an analyst at his client, Adviser A.  Worrall knew through discussions with Blaszczak that Blaszczak's clients included hedge funds that traded in the healthcare sector.

### Blaszczak Received Information from Worrall, Which He Knew, Should Have Known, or Consciously Avoided Knowing Was Tipped in Breach of a Duty

37.     During the Relevant Period, Worrall knowingly or recklessly tipped Blaszczak with material, nonpublic information concerning at least three nonpublic, rate-changing decisions.  In each instance, Blaszczak then knowingly or recklessly provided the material, nonpublic information to Huber and/or Fogel who caused Adviser A to place and execute trades in advance of all three announcements on behalf of the Hedge Funds it advised.

38.     Worrall and Blaszczak are close personal friends and have known each other

since at least 2001 when they both worked at CMS.  Prior to and during the Relevant Period, they met regularly for lunch, golf, baseball games, and drinks, and also met frequently at CMS, with Worrall sometimes signing Blaszczak in as his visitor.  Blaszczak and Worrall maintained ongoing contact through frequent text messages.  They also shared personal confidences.  For example, in October 2013, Blaszczak informed Worrall about health problems involving his family, saying that he had not discussed the issue with many people.

39.     Blaszczak understood that Worrall's position in the CM Director's Office provided him with access to confidential CMS information.  In January 2013, Blaszczak emailed a client at a healthcare company, "my friend Chris got promoted at CMS. He is now the T[echnical] A[dvisor]" for senior CM staff.  He added, "So [he] basically covers A, B, C, and D of CMS.  That is the best job ever at CMS – since he has his hands in all areas!  He seems to be really close to [the CM Director who] has him working on a bunch of projects for him.  The theme of everything is cost savings and efficiency."  In July 2013, Worrall emailed Blaszczak about how busy he was.  Blaszczak responded, "I bet you are busy.  You are in an awesome and important position."  Worrall replied, "Yeah.  Definitely now working with just about every senior person in the agency."

40.     Blaszczak also knew that Worrall's responsibilities included managing the "real time database," and that this role gave Worrall access to important CMS information.  For example, in March 2012, Blaszczak emailed Worrall about "your database on E[nd] S[tage] R[enal] D[isease]" and its use in tracking events for dialysis patients and making policy decisions.  That same month, Blaszczak also responded to a client's question about "worrals [sic] database" by stating, "Database has [Parts] abcd.  Its [sic] all of medicare and Medicaid claims data . . . ."  A few months later, in providing information in response to another firm's question

regarding a new information group at CMS, Blaszczak noted, "And that response came from chris who runs the real time database."

41.     Based on his former employment at CMS and the timeliness and accuracy of the information he received from Worrall, Blaszczak knew, should have known, or consciously avoided knowing that the material, nonpublic information conveyed to him by Worrall was conveyed in violation of a duty.  As a former CMS employee, Blaszczak was familiar with a CMS employee's duty to keep nonpublic information confidential.  In addition, the nature of the information that Worrall gave to him also indicated that the information was nonpublic and inappropriate for Worrall to share.  For example, as discussed below, Blaszczak knew, should have known, or consciously avoided knowing that Worrall was providing material, nonpublic information in breach of a duty when Worrall gave him slides containing internal CMS data regarding end-stage renal disease ("ESRD") from the "real time database" Worrall controlled.  In September 2012, following a lunch with Worrall, Blaszczak received compliance training through Potomac Research that included the STOCK Act.  For part of 2013, Blaszczak served as HillCo's Chief Compliance Officer.  In addition, Blaszczak's knowledge that the information he received from Worrall was material and nonpublic is evidenced by his repeated claims to clients that he had information superior to that of other analysts.

42.     Worrall received a personal benefit from his disclosure of material, nonpublic CMS information to his friend, Blaszczak, in the form of past and potential future pecuniary gain.  This included a job opportunity that Worrall used to leverage a promotion at CMS and potential future employment.  Worrall also received the benefit of giving valuable, confidential information to a close, long-term friend.

43.     In September 2011, Blaszczak tried to interest Worrall in joining a healthcare

policy firm.  In a September 28, 2011 email to his wife, Worrall said that it was a "big

opportunity," stating, "[n]ote that these people have political links.  If I ever do want to really get

into politics, like run for Congress, these are the types of people I'd need to be around."  Worrall

did not take the job, but he leveraged the opportunity to obtain a promotion at CMS, which he

received in December 2012.  He received a promotion to a position at the top of the agency's pay

scale, a $10,000 raise, and became a supervisor of other employees for the first time.

44.     Blaszczak and Worrall had other conversations concerning potential pecuniary

gain for Worrall, including discussions of Worrall potentially moving to employment in the

private sector.  These discussions occurred in the broader context of multiple CMS employees

leaving the government for private sector jobs, which Worrall and Blaszczak both knew.

Consulting firms, as well as law firms with lobbying and consulting arms, highlighted these new

hires, and emphasized the value of their CMS experience in press releases and on their websites.

Worrall understood the financial implications of such moves to the private sector.  In October

2011, Blaszczak emailed Worrall that a senior CMS official was speaking on a panel, and

Worrall replied in part, "Dude will make big money when he decides to leave CMS."  In March

2013, during the second trading event described below (paragraphs 95 through 138), Blaszczak

introduced Worrall via email to a staffer on the Senate Finance Committee to assist Worrall with

professional networking, and Worrall responded expressing his appreciation.

45.     Worrall and Blaszczak continued to have such discussions after the three trading

events discussed below.  For example, in August 2014, Worrall and Blaszczak discussed in a

series of text messages the possibility of Worrall leaving CMS to join the new policy firm that

Blaszczak was establishing.  Blaszczak asked Worrall, "When you going to join and be part

owner?"  Worrall replied, "you got time on Monday to talk?"  Blaszczak responded that he did

and then wrote, "Me and the two guys that work for me are on pace for 1.7 million total revenues for 2014.  I bet we come close to 2 million by end of year.  Things always pick up sept to dec."  Blaszczak also wrote, "We'd kill it working togethe[r]."  Worrall responded, "You're like a drunk whore to me.  Hard to resist.  Lol.  Let's talk."  That Monday, Worrall and Blaszczak made plans to meet at a bar after work.  The morning after, Worrall texted Blaszczak and said, "I have some thoughts.  Want to talk again.  We should catch an O's or Nats game."  Blaszczak responded, "Great.  Would l[o]ve to hear it.  Let's figure some days to meet up."

### Huber and Fogel Caused Trades Based on Information Passed to Them that They Knew, Should Have Known, or Consciously Avoided Knowing Was Tipped in Breach of a Duty

46.     As described above and below, during the Relevant Period, Worrall knowingly or recklessly tipped Blaszczak with material, nonpublic information that Worrall misappropriated from CMS concerning three nonpublic CMS decisions.  In each instance, Blaszczak then knowingly or recklessly tipped Huber and/or Fogel, who caused Adviser A to place and execute trades on behalf of one or more of the Hedge Funds in advance of all three CMS announcements.

47.     Blaszczak has known Huber and Fogel since at least 2009.  In an August 25, 2009 email to a prospective employer, Blaszczak identified Adviser A as his most important client and Huber and Fogel as his most significant contacts at that firm.  As Blaszczak moved from one consulting firm to another, Adviser A transferred its business to each of Blaszczak's firms.

48.     Blaszczak knew that Huber and Fogel expected him to give them information that would impact stock prices.  In December 2012, Blaszczak wrote to a client, "The people I know at [Adviser A] are extremely smart people and value reimbursement work alot [sic] but there is a ton of pressure to be right and they need to make money on the issue (stocks must move) or else they won't be happy."

49.     During the Relevant Period, Adviser A paid Blaszczak's firms a total of at least $193,000.  Huber and Fogel knew that Adviser A paid Blaszczak's firms for his services. Adviser A's contract with ADVI specifically provided for the award of performance bonuses, and Fogel and Huber advocated internally at Adviser A that such bonus payments be paid to Blaszczak's firms based on the information he provided.  In August 2012, after the first trading event described below regarding radiation oncology, Huber wrote internally to others at Adviser A, "I think Dave earned his bonus with his work on Rad Onc in Q2.  We did pretty well on that and it was really 100% Dave."

50.     As detailed more fully below, Huber and Fogel knew, should have known, or consciously avoided knowing that the information passed to them by Blaszczak was conveyed in breach of a duty for a personal benefit such as personal friendship or potential future pecuniary gain.  Huber and Fogel were experienced industry professionals and were knowledgable about the healthcare industry and government regulators of the industry including CMS.  They also knew, should have known, or consciously avoided knowing that:

a)   Blaszczak had a source of information at CMS;

b)   A CMS employee who passed information about a nonpublic CMS rate announcement did so in breach of a duty;

c)   CMS personnel, including Blaszczak himself, routinely left CMS for private sector employment;

d)   Blaszczak remained friends with CMS employees; and

e)   the information they received from Blaszczak was unusually specific, accurate, and became increasingly specific in the days and weeks leading up to the public announcement of proposed and final rules, and that the source of

such information would not likely breach a duty by disclosing the information absent a personal benefit.

51.     Huber and Fogel knew, should have known or consciously avoided knowing that information they received from Blaszczak came from sources within CMS.  In communications with Huber and/or Fogel, Blaszczak bragged that his competitors did not know anybody on the inside at CMS.  Blaszczak also provided them with CMS's internal expected release dates and delays for reimbursement rate decisions, shared details of meetings among senior officials at CMS including agenda items, and stated that he had met with people at CMS and knew what CMS staff had proposed internally.  In addition, Huber and Fogel sought information about pending, nonpublic CMS decisions from Blaszczak, and they relied on the information Blaszczak provided to inform trading decisions.  They also sought periodic updates from Blaszczak as the anticipated public announcements of CMS decisions neared.

52.     In September 2010, Fogel sent an email to Huber and others at Adviser A summarizing a communication with Blaszczak.  Fogel relayed Blaszczak's information about CMS's future plans for payments for radiation oncology treatments and reported that, "[t]here is a closed-door meeting next week and Blaczack [sic] has a guy there . . . regulation would be announced in 2011, effective 2012."

53.     In September 2011, Huber emailed with Blaszczak regarding a comment letter from a Medicare Administrative Contractor concerning an anticipated coverage decision.  Huber asked Blaszczak: "Is it already public or did you just hear about it from CMS guys?  Any sense how strong an endorsement it is?"

54.     In January 2012, Huber sent an email to Fogel and others at Adviser A conveying information Blaszczak had provided about the specifics of a confidential, proposed CMS

coverage determination addressing Medicare coverage for a heart valve repair procedure.  CMS was expected to release its determination within the next two months.  Huber emphasized Blaszczak's conviction that the information was reliable, stating that Blaszczak, "has high confidence, talked to CMS folks," adding, "[h]e hasn't seen documents.  He has a good feel from the conversations."  Twelve days later, Huber sent another email to the same Adviser A recipients updating his communications with Blaszczak, "CMS lawyers are going through the document now.  They softened some of the [] language but its [sic] still negative."

55.     In June 2012, Huber sent an email to Fogel and others summarizing a call with Blaszczak, including that "he met with senior CMS people recently" and that Blaszczak reported internal CMS plans and concerns.

56.     Huber and Fogel also encouraged Blaszczak to cultivate other CMS sources.  In March and April 2012, just weeks before the first trading event described below (paragraphs 64 through 94), Blaszczak informed Huber and Fogel that he had identified a CMS contractor who worked for a company that was believed to be working with CMS regarding reimbursement rates for certain medical tests.  Blaszczak emailed Huber and Fogel once he made contact with the contractor, and they pressed Blaszczak to get the information.  Blaszczak said, "Here's my chance . . . ."  Huber responded, "Just tell him your [sic] doing god's work."  Fogel added, "This is huge dude . . . don't blow it!  You just turned my frown upside down so let us know if he bites.  [The contractor] is the man with the keys to these companies' coffins [sic]. . . ."  When the contractor did not respond positively, Blaszczak told Huber he thought he still would "get a look" before the information was made public.

57.     During the Relevant Period, Huber and Fogel were subject to Adviser A's Code of Ethics and Policies and Procedures, which prohibits insider trading.  Upon information and

belief, they also received copies of these documents prior to and during the Relevant Period. Huber and Fogel also attended Adviser A's training on the prohibition of insider trading during the Relevant Period.

58.     Huber and Fogel knew, should have known, or consciously avoided knowing that the CMS employee who provided information to Blaszczak about a CMS rate announcement breached a duty, based on the nonpublic nature of the information provided by an employee of a federal government agency.  Huber and Fogel were experienced financial analysts covering the healthcare sector and had been licensed in the securities industry.

59.     Huber and Fogel knew, should have known, or consciously avoided knowing that CMS personnel often left CMS for lucrative private sector jobs.  Blaszczak referenced his own former CMS employment in emails with Fogel, and his firms' websites touted his status as a former CMS employee.  In 2013, one of Blaszczak's former firms, Potomac Research, invited Huber and Fogel to a conference where the panelists included former CMS staffers who had joined a consulting firm and secured a law firm partnership.

60.     As detailed below, Huber and Fogel repeatedly received information from Blaszczak that was unusually specific and accurate.  Moreover, Blaszczak's information became increasingly specific in the time leading up to the rule announcements.

61.     Huber and Fogel also knew that Blaszczak's information was particularly accurate compared to others opining about the same topics.  For example, Fogel noted to others at Adviser A that Blaszczak was "an outlier on the street" for one announcement and that his information was "[w]ay more valuable than the other dc clowns put together."  The accuracy of Blaszczak's inside information was confirmed to Huber and Fogel once the public announcements occurred, with Fogel even noting to others at Adviser A that one announcement was "exactly as we

expected."

## Trading Ahead of the Three Announcements

62.     Adviser A traded on behalf of the Hedge Funds shortly before three CMS announcements regarding previously nonpublic rate-changing decisions that affected the stock prices of four issuers.  Common to each trading event are the following:  (1) CMS prepared changes to Medicare reimbursements rates that affected a small set of companies that offered products and services in the impacted healthcare sectors; (2) Worrall, by virtue of his position, had access to and obtained information about internal CMS deliberations regarding these reimbursement rate decisions; (3) Worrall communicated this information to Blaszczak by telephone calls, texts, and in-person meetings after CMS had made specific decisions about the rate changes but before that information was made public; (4) shortly after Worrall and Blaszczak communicated, Blaszczak communicated this information to Huber and/or Fogel by telephone calls, email, and in-person meetings; and (5) within days, and sometimes within minutes, of these communications with Blaszczak, Adviser A began trading securities in the affected companies on the basis of the information received from Blaszczak.

## The CMS Announcements

63.     The insider trading scheme,  operated in the same manner with respect to all three of the CMS announcements set forth below.

### 1.     CMS Announcement Number 1:  July 6, 2012, Physician Fee Schedule Rule Related to Radiation Oncology (Trading in VAR and EKTAB)

64.     On July 6, 2012, after the market closed, CMS announced a preliminary decision to reduce the reimbursable treatment times for two radiation oncology procedures.  The rule proposed to reduce the treatment time for intensity modulated radiation therapy ("IMRT") from 60 to 30 minutes and for stereotactic body radiotherapy ("SBRT") from 90 to 60 minutes.  This

decision was highly confidential and was not intended to be disclosed before this public
announcement by CMS on July 6.

65.     In preparation for this confidential, upcoming rule, on April 18, 2012, personnel
in the Office of the CM Director received a confidential briefing paper that discussed proposed
reimbursement cuts to the radiation oncology procedures as part of the rule. Each page of the
briefing paper was labeled as follows:

> INFORMATION NOT RELEASEABLE TO THE PUBLIC
> UNLESS AUTHORIZED BY LAW:
>
> This information has not been publicly disclosed and may be
> privileged and confidential.  It is for internal government use only
> and must not be disseminated, distributed, or copied to persons not
> authorized to receive the information.  Unauthorized disclosure
> may result in prosecution to the full extent of the law.

66.     The briefing paper proposed cutting the reimbursable treatment times for IMRT
from 60 to 30 minutes and for SBRT from 90 minutes to 60 minutes.  The briefing paper noted
that such a change, *i.e.*, a downward adjustment to the treatment times for these procedures
resulting in Medicare reimbursement cuts, would result in "a sizeable negative impact on overall
payments to radiation oncology."  The briefing paper also observed that "IMRT treatment is a
significant portion of Medicare services provided by radiation oncologists."

67.     Five of the ten staff in the CM Director's Office received the briefing paper.
Upon information and belief, Worrall learned the information conveyed in the briefing paper
while it was nonpublic.

68.     On May 8, 2012, Blaszczak exchanged two calls with Worrall and then met with
Worrall at CMS.  Within minutes of the second call, Worrall authorized Blaszczak's entry to
CMS by signing him in.

69.     Upon information and belief, Worrall provided Blaszczak with material

information about the radiation oncology reimbursement cuts while the information was still
nonpublic.

70.     On May 9, Fogel called Blaszczak, and they spoke for 12 minutes.  Blaszczak
passed Fogel the information that Worrall had provided to Blaszczak.  Less than half an hour
later, Fogel emailed others at Adviser A, including Huber, and reported on his call with
Blaszczak, "Rad[iation]onc[ology] update is most interesting – re-evaluating a key time
component in main rad[iation]onc[ology] codes and cutting time in half, which essentially cuts
the reimb[ursement] in half or a little less for the main IMRT code . . . .  This would be in
phys[ician] fee schedule and/or [Outpatient Prospective Payment System] proposed rules in late-
June/early-July in all likelihood.  He'll be sending us more detail as he gets it but this seems like
a huge deal to me . . . . meaningful reimb[ursement] cuts make this entire market collapse . . . ."

71.     On May 10, 2012, Fogel emailed others at Adviser A, including Huber,
referencing the specific radiation oncology treatments mentioned in the confidential CMS
briefing paper.  Fogel stated, "We need inputs from DB [Blaszczak] to firm up on:  1) size of
cuts to rest of IMRT codes and [SBRT] code, and resulting total, case-weighted cuts to
Rad[iation]Onc[ology and a]. . . (3) more refined sense of timing (beyond 'late-June/early July').
[j]ust as a reminder, in 2009 when CMS proposed a large cut to IMRT in free-standing ctrs,
VAR stock got hammered. . . if payment does get sliced, this could get REAL ugly for VAR,
EKTAB, and [the stock of another radiation oncology company]  . . . ."  Fogel suggested that
Adviser A acquire a short position in VAR,[1] a manufacturer of medical devices and software for
radiotherapy, and EKTAB, another company in the radiation oncology field.

---

[1]     To "sell short" is to sell a security that one does not own, but rather has arranged to borrow from a third
party, with the intention of purchasing (also called "covering") the security at a later date.  A short seller stands to
gain if the price of the security declines between the short sale and the purchase because the short seller has sold the
security at a price that is greater than the purchase price.

72.     On May 21, 2012, Fogel sent a follow-up email to Huber and others at Adviser A reporting another communication with Blaszczak, in which Blaszczak passed him information that Worrall had provided Blaszczak.  The email included the specific radiation oncology cuts that had been discussed in CMS's April 18 internal briefing paper, "RadOnc – 60 mins to 30 for IMRT 50% cut for the main code, for SBRT it's 90 down to 60 minutes . . . ."  In a portion of the email discussing a different CMS topic, Fogel wrote about Blaszczak, "he spoke to CMS people . . . [h]e spoke [to] staffers doing all the work."

73.     On June 6, 2012, Huber emailed Fogel that another radiation oncology provider, "might be worth shorting along with VAR [if] DB's call on rad onc cuts holds up."

74.     Later on June 6, 2012, Huber emailed Fogel and others at Adviser A regarding a call Huber had with Blaszczak that day, in which Blaszczak passed him information that Worrall had provided Blaszczak.  Huber wrote, "VAR: Prelim rule targeted for June 27.  He thinks it will come a week or so later."  The April 18 internal CM briefing paper provided the same target date — June 27 — for release of the preliminary rule.

75.     Huber further wrote, "[Blaszczak] is lying low on this until the release date given how charged it is."  Upon information and belief, this meant that Blaszczak was giving Adviser A a trading advantage by giving Adviser A information before giving that information to his other clients.  Huber's summary of his June 6, 2012 call with Blaszczak also reported the specific, confidential figures proposed internally at CMS, which had adjusted the reimbursable treatment times for IMRT and SBRT: "Rad Onc: Mechanism: Its [sic] 60 to 30 minutes for IMRT which will reduce payment for main code.  Net results is 30% type reduction in IMRT payments.  SRS [sic] 90 to 60.  Foir [sic] SBRT."

76.     In the same email, discussing a different company, Huber wrote about Blaszczak,

"[H]e met with senior CMS people recently."

77.      On June 7, 2012, Fogel emailed other Adviser A employees, stating, "We're all on board to increase our exposure to the upcoming proposed cuts to RadOnc" and recommended that Adviser A trade VAR, EKTAB, and another radiation oncology stock.  Fogel emphasized both the nonpublic and material nature of the information Blaszczak had provided to Adviser A regarding the upcoming cuts – information that other analysts did not have – adding, "Reminder on timing – CMS expects to release ~ Jun 27 but DB thinks it slips by a week for the proposal. And who knows if he or others write something at some point . . . so if it were tomorrow we'd be quite big for this scare, but since it's not we thought of increasing some now and more in the coming 1 – 2 wks."

78.      An Adviser A portfolio manager approved the trade within minutes of Fogel's email, and Adviser A entered orders to sell short a total of 105,000 shares of VAR and 118,000 shares of EKTAB on behalf of Hedge Fund 2 and Hedge Fund 3.  These orders were executed between June 7 and June 14, 2012.  These transactions were based on the material, nonpublic information about the reductions in reimbursable treatment times for radiation oncology procedures that, as detailed above, Worrall had given to Blaszczak, and that Blaszczak then transmitted to Fogel and Huber, who caused Adviser A to engage in the transactions.

79.      On June 11, 2012, Blaszczak met with Huber and others, at Adviser A's offices in New York, in which Blaszczak passed him information that Worrall had provided Blaszczak.. Shortly after the meeting was scheduled to end, Huber sent an email summarizing Blaszczak's "call" regarding several stocks.  The email recited the specific, internal CMS proposed cuts for radiation oncology treatment times: "They are looking at the time, 60-30 for imprt [sic], 90-60 for SRS [sic]."  Huber's notes added, "Staff has proposed this.  [T]here is concern about politics.

They have better methodology this time."  In the same email, Huber reported that Blaszczak said that he "[t]hinks he will get a look" at reimbursement rates affecting a different company that were expected to be announced in a few months.  Huber also shared information that Blaszczak had obtained concerning the CMS real time database's analysis and conclusions for a different reimbursement rate-related issue.

80.     Later on June 11, 2012, Fogel sent Blaszczak a competitor's research note.  The competitor's note did not mention that CMS was planning to cut the reimbursement for IMRT and SBRT by adjusting the reimbursable treatment times for those procedures.  As discussed above, Blaszczak had provided information regarding cuts to IMRT and SBRT to Huber and Fogel at least as early as June 6.  Without this information, the competitor predicted an overall cut of just 3-5% for radiation oncology treatments.  In his email, copying Huber and another Adviser A employee, Fogel asked Blaszczak whether the competitor was "just totally missing the time adjustment issue."  Blaszczak agreed, referencing the fact that the information regarding time adjustments that he had provided to Huber and Fogel was nonpublic, stating, "Yes but the time adjustment is not out there so would not expects [sic] notes on it."

81.     On June 13, 2012, Blaszczak emailed Fogel further thoughts on Blaszczak's competitor following another message from the competitor with market commentary about a CMS issue unrelated to the radiation oncology cuts.  Blaszczak wrote, "i can say with 100% confidence he doesn't know anyone at CMS.  His guesses are just wild random guesses.  I wouldn't read into what he says[.]"  Fogel replied, "I agree w all u said."

82.     On June 14, 2012, Adviser A increased Hedge Fund 2's and Hedge Fund 3's short positions in VAR by an additional total of 90,000 shares collectively.  These transactions were based on material, nonpublic information about the reductions in reimbursable treatment times

for radiation oncology procedures that, as detailed above, Worrall had given to Blaszczak, and that Blaszczak then transmitted to Huber and Fogel, who caused Adviser A to engage in the transactions.

83.     Later on June 14, 2012, Huber and Fogel exchanged emails noting that another D.C. analyst had just called Adviser A and said that CMS was strongly considering reducing the reimbursable amount for IMRT from 60 to 20-30 minutes (but with no mention of any cuts to SBRT).  Fogel expressed concern that this analyst was "now the 2nd one with the same message as DB which is a big negative and totally off the radar.  So the risk of this getting out there" before CMS issued the rule had increased, therefore "justifying moving up our timelines for exposure by some amount."  Fogel recommended shorting more VAR and EKTAB.

84.     Huber replied that he "agreed on shorting more."  Huber said he would add more to VAR "given we think it has the biggest exposure" and they should be "very large in this trade by the end of the month if Dave's inputs don't change. . . ."  He noted that if the other D.C. analyst "is starting to get noisy about this (Dave has been very quiet) then VAR could trade week [sic] for the next couple of weeks so I'd short more now."  Huber added that, "Dave should be giving us updated info on timing and content later in the month."

85.     On June 15, 2012, Adviser A shorted a total of another 90,000 shares of VAR and 75,000 shares of EKTAB on behalf of the same funds.  Adviser A added to these short positions on June 18 by placing orders to short an additional 250,000 shares of VAR and an additional 80,000 shares of EKTAB on behalf of the same funds.  On June 19 and 20, Adviser A shorted a total of an additional 103,253 shares and an additional 62,000 shares, respectively, of EKTAB on behalf of the same funds.  These transactions were based on the material, nonpublic information about the reductions in reimbursable treatment times for radiation oncology procedures that, as

detailed above, Worrall had given to Blaszczak, and that Blaszczak then transmitted to Fogel and Huber, who caused Adviser A to engage in the transactions.

86.     On June 22, 2012, Blaszczak and Worrall met for lunch.  Worrall authorized Blaszczak's entry to CMS by signing him in at 12:55 p.m.  At  2:11 p.m., Blaszczak had an 8 minute call with Huber.  Nine minutes later, Huber emailed Fogel, "I just talked to dave . . . . Tried to dial you in.  Checked in on rad onc too.  No news there yet."

87.     At 1:22 p.m. on June 25, 2012, Blaszczak called Adviser A and spoke for 18 minutes, during which Blaszczak passed him information that Worrall had provided Blaszczak.  At 2:16 p.m., Adviser A placed orders to short another total of 90,000 shares of VAR on behalf of Hedge Fund 2 and Hedge Fund 3.  These transactions were based on the material, nonpublic information about the reductions in reimbursable treatment times for radiation oncology procedures that, as detailed above, Worrall had given to Blaszczak, and that Blaszczak then transmitted to Fogel and Huber, who caused Adviser A to engage in the transactions.

88.     On June 29, 2012, Huber emailed Fogel and other Adviser A personnel about the nonpublic radiation oncology reimbursement rate cuts.  In the email, Huber noted that Blaszczak had "heard from an attendee" of a meeting two days before "between [Office of Management and Budget] and senior staff at CMS to sort through outstanding issues."  Huber wrote that, because the radiation oncology adjustments were not on the meeting agenda, "Dave believe[s] its [sic] on track.  Dave asserts that if something had changed, he would have heard about it – no new news on rad onc if [sic] good news.  I'd add to our position given the date (CMS targeted today for publication of the rule but Dave thinks its next week), price moves and this input."  Within twenty minutes, Adviser A placed an order to short a total of 175,000 shares, which was executed collectively by Hedge Funds 1, 2, and 3 between June 29 and July 2, 2012.  These

transactions were based on the material, nonpublic information about the reductions in reimbursable treatment times for radiation oncology procedures that, as detailed above, Worrall had given to Blaszczak, and that Blaszczak then transmitted to Fogel and Huber, who caused Adviser A to engage in the transactions.

89. Several days later, on July 2, 2012, Blaszczak issued a note to certain clients, including Huber, Fogel, and others at Adviser A, titled "Radiation Oncology (VAR, ARAY): Cuts likely to be Higher than Expected in CY 2013 Proposed Medicare Regulations." Upon seeing Blaszczak's information more widely disseminated to other clients, another Adviser A analyst wrote to Huber, Fogel, and others at Adviser A, "Thar she blows[.]" In the note, Blaszczak focused on the specific radiation oncology treatments (IMRT and SBRT) and time adjustments under confidential consideration at CMS: "We think there are going to be significant changes to calculating radiation oncology reimbursement. . . . CMS takes into consideration that intensity modulated radiation therapy (IMRT) treatment takes 60 minutes . . . [T]echnology has changed and the treatment time is much shorter – approximately 20-30 minutes . . . For stereotactic radio surgery [sic], the treatment time baked into the payment methodology is 90 minutes. We think most recent survey data would reveal that treatment is only 60 minutes."

90. On July 6, 2012, after the market closed, CMS publicly disclosed the preliminary rule, which proposed to reduce the reimbursable treatment time for IMRT and SBRT in the exact manner and amounts that Blaszczak had told Huber and Fogel — from 60 to 30 minutes for IMRT and the from 90 to 60 minutes for SBRT.

91. Later that day, Fogel shared the text of the preliminary rule with his Adviser A colleagues noting that "they reduced time for IMRT in half from 60 to 30 and SBRT from 90

down to 60 minutes, exactly as we expected."

92.     On July 9, 2012, the following trading day after CMS publicly released the preliminary rule, VAR's stock closed at $57.94 per share, a decrease of 3% over the prior day's close, with an increased trading volume of approximately 205% from the average daily trading volume over the previous four weeks.  As of July 9, 2012, Hedge Fund 2 made approximately $864,787 from its timely shorting of VAR; Hedge Fund 3 made approximately $697,203 from its timely shorting of VAR; and Hedge Fund 1 made approximately $62,728 from its timely shorting of VAR.  Also as of July 9, 2012, Hedge Fund 2 and Hedge Fund 3 made another approximately $251,562, and $189,775, respectively, from their timely shorting of EKTAB, whose stock closed at $45.07 per share on July 9, a decrease of approximately 1.97% over the prior day's close, with an increased trading volume of approximately 27% from the average daily trading volume over the previous four weeks.  These profits resulted from the material, nonpublic information about CMS reductions in reimbursable treatment times for radiation oncology procedures that Worrall had given to Blaszczak including through the communications detailed above, and that Blaszczak then transmitted to Fogel and Huber, who caused Adviser A to engage in the transactions described above on behalf of the Hedge Funds.

93.     On or before July 17, 2012, CM staff who had worked on the radiation oncology reimbursement rule obtained a copy of Blaszczak's July 2 note.  One staffer commented, "Note the date on this report below which precedes the physician fee schedule public display date." Also reflecting the nonpublic nature of Blaszczak's information another CM staff member asked, "Where does he get his information from?  It is pretty unbelievable and will probably blow up at some point."  He later added, "Don't know but it is obviously someone with access to our impact papers.  I just can't see the motivation for sharing this information.  I would doubt someone is

trading based on it as they [sic] would be both a crime and require lying on financial disclosure reports which does not seem worth the risk."

94.     Shortly after the profitable trades, in August 2012, Huber advocated internally at Adviser A for a bonus for Blaszczak for the second quarter of that year, which covered the firm's trading related to CMS's preliminary decision concerning radiation oncology.  Huber wrote, "I think Dave earned his bonus with his work on Rad Onc in Q2.  We did pretty well on that and it was really 100% Dave."

### 2.     CMS Announcement Number 2:  July 1, 2013 ESRD Rule (Trading in FMS and FME GY)

95.     The insider trading scheme, including the ways in which Worrall accessed CMS's confidential information, how Worrall passed the information to Blaszczak, and how Blaszczak passed the information to Huber and/or Fogel worked in the same manner with respect to the proposed ESRD rule relating to kidney dialysis.

96.     On July 1, 2013, after the market closed, CMS announced a preliminary decision in the ESRD rule to reduce the per treatment reimbursement amount (the "base rate") for certain kidney dialysis treatments, services, and drugs by 12%.  The decision to reduce the single Medicare payment rate for these "bundled" treatments, services, and drugs, was highly confidential and was not intended to be disclosed publicly before CMS released the proposed ESRD rule on July 1.

97.     The market had anticipated that CMS would issue an ESRD Rule in 2013 cutting the base rate in response to a Government Accountability Office ("GAO") study, Congressional legislation, and a report issued by the Department of Health and Human Services' Office of Inspector General ("HHS OIG").  The GAO study, which was issued in December 2012, found that utilization of ESRD drugs in 2011 was lower than drug utilization levels in 2007.  U.S.

Gov't Accountability Office, GAO-13-190R, *End-Stage Renal Disease: Reduction in Drug Utilization Suggests Bundled Payment Is Too High* (2012). Because the existing ESRD base rate was based on 2007 drug utilization levels, the GAO study suggested CMS may have paid more than necessary for dialysis care in 2011. In response, Congress passed the American Taxpayer Relief Act of 2012 ("ATRA"), Pub. L. No. 112-240, 126 Stat. 2313. The law was enacted in January 2013 and authorized CMS to make reductions in the ESRD base rate on or before January 1, 2014, by comparing drug utilization data from 2007 with data from 2012. In May 2013, HHS OIG released a report showing a decrease in the utilization of certain dialysis drugs. The HHS OIG report also concluded that CMS likely overpaid for certain dialysis treatments in 2011 by using the 2007 ESRD base rate. U.S. Dep't of Health and Human Services, OIG, *Medicare and Beneficiaries Could Save Millions If Dialysis Payments Were Adjusted for Anemia Management Drug Utilization*, (A-01-12-00522), (2013).

98. On January 4, 2013, just days after ATRA was enacted, a staff member in the CM group working on the upcoming ESRD rule contacted Worrall. The staff member advised Worrall that the base rate in the Rule would be reduced, following recent legislation, to reflect changes in drug utilization using 2012 data. In a reference to the "real-time" database that Worrall managed, the staff member suggested a meeting in which they could discuss, among other items, "what initiatives are in place with our monitoring that could assist in decision making in the near future," and Worrall agreed.

99. On February 8, 2013, Worrall received briefing slides for the CM Director containing CMS's internal analyses and policy recommendations for the upcoming ESRD rule, although not the proposed rate change itself. The slides included a recommendation to implement ATRA's directive that CMS reduce the ESRD PPS base rate to reflect the decrease in

drug utilization.  These slides also displayed warnings that the information had not been publicly disclosed and were "for internal government use only[.]"  The warnings stated that "[u]nauthorized disclosure may result in prosecution to the full extent of the law."

100.    On February 22, 2013, Worrall emailed another set of draft slides to a colleague for the CM Director to use in a March 5 presentation to an entity representing the kidney care community.  These slides showed drug utilization data from the real time ESRD database managed by Worrall.  Worrall cautioned that the last tab in the slide deck was an Excel workbook and said, "I'm leaving that in more as an FYI for discussion than anything else.  I don't think it should be publicly disclosed."  Worrall met with the CM Director about the presentation later that day.

101.    On March 5, 2013, the CM Director gave his presentation to the entity representing the kidney care community using a revised slide deck that Worrall had helped prepare.  The CM Director's presentation did not contain the Excel workbook Worrall said should remain confidential on February 22.

102.    Blaszczak visited CMS on March 5, 2013.  Three days later, on March 8, 2013, Blaszczak introduced Worrall via email to a staffer on the Senate Finance Committee, which oversees CMS.  After Worrall separately asked Blaszczak why he thought it would be good for Worrall to meet the staffer, Blaszczak responded, "I am just a big believer in networking and [the staffer] is a guy that knows a lot of people in DC and will be in and out of positions affiliated w the [political] party.  He probably will be leaving the hill soon but told me he will return again or work in a [political party] administration."  Blaszczak stressed to Worrall that Worrall's "knowledge and experience is going to be extremely valuable," and Worrall should "meet as many people as possible along the way."  Worrall responded expressing his appreciation.

103.    On March 13, 2013, Blaszczak scanned a paper copy of slides that contained
substantially similar information to the internal slide deck Worrall sent the CM Director for the
public March 5 presentation.  Upon information and belief, Blaszczak obtained the slides from
Worrall.  Worrall's office computer hard drive contained the same internal version of the slides
that Blaszczak scanned.  Blaszczak scanned the slides to create a PDF version of them.
Blaszczak's paper copy contained certain nonpublic slides including the Excel workbook that
Worrall previously said should not be made public.  Blaszczak titled the PDF of the slides,
"ESRDrealtimedata," which referred to how Blaszczak described the ESRD database that
Worrall oversaw — the "real time database" — and emailed it to a client.  Blaszczak's email
with the slides stated, "[S]ee attached for the latest data regarding ESRD utilization . . .  I think
the data is up to Jan 1, 2013 . . ."  Reflecting his awareness that the slides were nonpublic
government documents, Blaszczak added, "It's very important to keep this info
CONFIDENTIAL and don't send to others outside [your company]" (emphasis in original).

104.    On March 14, 2013, Blaszczak scanned a paper copy of the confidential briefing
slide deck that Worrall received on February 8 and which contained CMS's internal analyses and
policy recommendations for the upcoming ESRD rule.  Upon information and belief, Blaszczak
received the slide deck from Worrall.  Blaszczak scanned the slides to create a PDF version of
them.  The paper copy Blaszczak scanned had been formatted electronically to print two slides
per page and displayed the CMS warnings that the information had not been disclosed to the
public, was for internal use only, should not be released to the public unless authorized by law,
and unauthorized disclosure could result in prosecution.  One slide displayed the date
"02/08/2013," the date that Worrall received the slides.  A little over nine minutes later,
Blaszczak scanned another hard copy of the confidential briefing slides.  This version was

identical to the one Blaszczak had scanned a few minutes earlier except that the CMS warnings had been removed.  Blaszczak titled the PDF without the CMS warnings "ESRD PPS CY 2014" and emailed it to the same client to whom he sent the "ESRDrealtimedata" PDF a day earlier. Blaszczak reminded the client not to disclose the slides outside that company.

105.    Blaszczak's client responded with information regarding the analyst who took over Blaszczak's position at his former political intelligence firm, Potomac Research, stating, "The new Dave has been told by Potomac to be very careful with running with detail that is not public knowledge.  So for instance when he talks with CMS staff he has to say 'don't tell me anything you don't want made public.'"  According to the client, a colleague at the client's company had responded by advising Blaszczak's successor, "'well you are going to suck at your job then.'"  The client also wrote about the client's impression that CMS "is also skittish of giving intel to people because info got out that was not public and there is a big problem."

106.    On April 1, 2013, Blaszczak updated other employees of his firm about the two slide decks he had sent to the client, stating, "Regarding ESRD rulemaking – I basically gave [the client] CMS['s] plans for the proposed rule.  It was in the slides I sent them and outlines what cms intends to do.  They should be good there although the rebase number is yet to be decided.  I also gave [the client] all the latest ESRD real time data CMS has gathered thru [sic] their database."

107.    On April 19, 2013, Worrall signed Blaszczak in as a visitor to CMS, and they had lunch.

108.    Upon information and belief, Worrall provided Blaszczak with material information about the ESRD cuts while the information was still nonpublic.

109.    Six days after his lunch with Worrall, a client asked Blaszczak if he heard

anything interesting during his trip to CMS.  Blaszczak responded that, among other things, "ESRD reg development is behind.  I still get the impression the update will be a significant cut but the situation is very fluid and politicals haven't weighed in."

110.    On May 3, 2013, Worrall provided CMS colleagues with a document that discussed the use of the ESRD real time database to furnish data concerning changes in drug utilization patterns that ATRA required CMS to consider for the ESRD rule.

111.    On May 4, 2013, Huber emailed Blaszczak regarding "dialysis reimb[ursement] due June 27."  Huber asked whether Blaszczak had any view on what might be coming, noting that "[s]ome others are calling for up to a 5% cut due to the rebasing . . . We'd be interested in your views here."

112.    Blaszczak responded to Huber on May 6, 2013, passing him the information that Worrall had provided him.  Blaszczak said, "CMS is definitely pushing for a cut on the higher end in dialysis.  They sent a strong warning to people the other week to be prepared for significant cut."

113.    Also on May 6, 2013, the CMS Director sent a calendar invitation to staff in the CM Director's Office, including Worrall's supervisor.  Worrall's supervisor previously granted calendar access, including the ability to access attachments to calendar invitations, to her direct reports in the CM Director's Office, which included Worrall.  The calendar invitation was for a briefing concerning the upcoming ESRD rule and attached a confidential briefing paper with proposals for the ESRD rule.  At least four of Worrall's colleagues in the CM Director's Office received the confidential briefing paper.  In 2013, Worrall attended bi-weekly ESRD monitoring meetings with the ESRD staff who had drafted the confidential briefing paper.  Upon information and belief, Worrall learned the information conveyed in the briefing paper while it

was nonpublic.

114.    The briefing paper proposed, pursuant to Section 632 of ATRA, that CMS reduce the ESRD base rate by $29.52 per treatment, which was a 12% reimbursement cut, and noted that CMS had the option of implementing the cut over a transition period.  Each page of the briefing paper displayed warnings that the information had not been publicly released and was privileged and confidential.

115.    On May 8, 2013, CMS staff who attended the bi-weekly ESRD monitoring meetings with Worrall and who also had helped draft the ESRD briefing paper sent Worrall an email titled, "ESRD team and issues for 2013."  The email identified certain ESRD monitoring data the staff needed from Worrall and his team, "in preparation for payment review and modifications as authorized in Sec. 632 of ATRA."

116.    On June 3, 2013, one of Worrall's colleagues in the CM Director's Office emailed briefing slides for the Secretary of HHS to a colleague in the CM Director's Office and another CMS staff member.  The last page of the briefing slides concerned the proposed ESRD rule and recommended a three-year phase in for the reimbursement cut, with 50% of the total reduction in the first year and 25% in each of the subsequent two years.  Upon information and belief, Worrall learned the information conveyed in the briefing slides while it was nonpublic and conveyed it to Blaszczak in early June 2013.

117.    On June 4, 2013, Blaszczak spent the day at CMS.

118.    Upon information and belief, Worrall provided Blaszczak with material information about the ESRD cuts while the information was still nonpublic.

119.    On June 13, 2013, Blaszczak circulated a HillCo research note to clients, including Fogel and Huber, including material, nonpublic information that he had received from

Worrall.  The note, which clients accessed by logging in with a password to HillCo's web portal, stated that CMS was likely to propose a rate cut of 10 – 12%, phased in over three years, as part of the upcoming ESRD rule.  The note called this an "ugly cut and worst case scenario for dialysis facilities."

120.    In contrast, on the same day, Fogel received a research note from one of Blaszczak's competitors saying that, although data suggested a possible cut by 5% to 8%, CMS likely would not "reduce the bundle by that much" and instead was likely to propose a rate cut of only 2 – 4%.

121.    Over the next four days, Worrall and Blaszczak exchanged numerous text messages and attended a baseball game together.

122.    On June 18, 2013, at 8:43 a.m., Worrall sent a text message to Blaszczak. Approximately 40 minutes later, Blaszczak re-forwarded to Fogel his June 13 research note that stated that CMS would propose a reimbursement cut of 10 – 12%.  Blaszczak again passed Fogel the material, nonpublic information that Worrall had provided him.  Blaszczak pointed out that his information called for a more severe cut than other analysts had predicted, stating, "I think I am much higher than others on a cut."  Fogel replied, "How high? 4-5%?"  Blaszczak responded, "12% total but phased in over 3 years 50/25/25."  Later that day, Fogel sent Blaszczak's email internally to other analysts on Adviser A's services team.  One analyst commented that "clearly the market does not believe that" and that the market consensus was for a probable cut of only about 4%.

123.    On June 25, 2013, at 2:00 p.m., Fogel asked Blaszczak whether he still had the same expectations for the upcoming ESRD Rule.  Blaszczak reiterated that there was "[n]o change in my numbers.  I am pretty confident."  Blaszczak said the overall cut would be 12%,

phased in over three years.

124.    At 2:12 p.m. on June 25, 2013, Fogel forwarded Blaszczak's email to the services team.  Fogel stated that Blaszczak "is [an] outlier on the street on the size of that cut and if it's even 6% these stocks are going down let alone 12%."  Indeed, later that day, another analyst confirmed for Fogel that "DC policy shops . . . have been saying rebase could be 4 – 5%."  Fogel emailed with a colleague about whether to recommend a trade based on Blaszczak's information without doing additional analysis, which would require more time than Fogel had before the expected announcement.

125.    The same day, Fogel received an email indicating that an advocacy group for kidney care stakeholders and another political intelligence firm were predicting cuts of 2.5-3% and 5%, both much less aggressive than Blaszczak's tip.

126.    At 2:46 p.m. on June 25, 2013, Fogel conveyed the services team's recommendation to short FMS, a provider of kidney dialysis services, as well as FMS's common stock in Germany (FME GY), copying Huber and others on the email.

> We'd all do 50 [basis points] of Fresenius [FMS] short for the re-base / ESRD proposed rule (due any day). Street expectations for the re-base are in the 2-3% range and we're more in the 6-12% range (though that could be softened and/or phased-in for final rule).  Blaczack [sic] for one is an outlier at 12% assumed and he's guessing it's phased in as 6%/3%/3% cuts in 2014-2016.

127.    Less than two minutes later, Adviser A entered orders for Hedge Fund 1 and Hedge Fund 3 to sell short a total of 303,000 shares of FMS, of which 33,665 shares were executed.  Soon thereafter, Adviser A entered orders for the same funds to sell short a total of 138,000 shares of FMS's stock in Germany ("FME GY"), which were fully executed the next morning when the German market opened.  These transactions were based on the material, nonpublic information about the proposed ESRD rule relating to kidney dialysis that, as detailed

above, Worrall had given to Blaszczak, and that Blaszczak then transmitted to Fogel, who caused Adviser A to engage in the transactions.

128.    On Saturday, June 29, 2013, Blaszczak emailed a client regarding the cut he anticipated, referencing more recent data that supported his figure.  Blaszczak wrote that his firm was "off consensus.  Most expect a 3- 4% cut (overall) and we are at 12% but phased in over 3 years. *The reason for our high prediction amount are because the numbers for . . . ESRD drugs have continued to decline in recent months.*  The OIG and GAO report[s] only looks [sic] at utilization numbers up to a certain point" (emphasis added).  Worrall had access to data regarding the decline in utilization rates in recent months to which Blaszczak referred.  The same day, Blaszczak told another client, "we are way above consensus" regarding expected cuts to the dialysis rates.  He also wrote, "I understand most believe the overall cut to the bundled amount will be around 3-4%, with some at 6%.  We feel confident it will be closer to 12% and phased in."

129.    On July 1, 2013, Blaszczak emailed Fogel at 11:33 a.m., stating that the ESRD rule may be coming at 4:00 p.m. that day.

130.    Later that day, after the market closed, CMS released the ESRD rule, which included a proposed cut to the ESRD PPS base rate of 12% for certain kidney dialysis products and services to reflect changes in drug utilization.

131.    Following the CMS announcement, Blaszczak sent a research note to Adviser A in which he referenced the ESRD database overseen by Worrall, stating that the 12% cut would not change in the final rule, expected later that year, "because of the real-time data CMS has on lower drug utilization."

132.    Blaszczak sent a research note to another client on July 2, 2013, in which he also

referenced the ESRD database overseen by Worrall as a basis for his information, stating that CMS arrived at the 12% cut by accounting for "more recent utilization numbers based on their real-time database."

133.    Fogel noted internally at Adviser A that credit should go to Blaszczak for his information, which was "a huge outlier that nobody expected."

134.    On July 1, 2013, before the CMS announcement, a colleague emailed Fogel, "I really hope your boy is [r]ight on dialysis tonight."  After the announcement, the same colleague emailed Fogel, as part of the same email chain, "Right on dialysis tonight."  Fogel replied, "Boy was he ever right…"

135.    On July 2, 2013, the first trading day after CMS released the proposed ESRD rule, FMS's stock closed at $32.11 per share, a decrease of 9.5% over the prior day's closing price with an increased trading volume of approximately 656% from the average daily trading volume over the previous four weeks.  This market reaction reflected that the 12% cut was steeper than the market had anticipated based on publicly available information.

136.    As of July 2, 2013, Hedge Fund 1 and Hedge Fund 3 profited by approximately $56,694 and $44,178, respectively, due to their timely short positions in FMS.  As of the same date, Hedge Fund 1 and Hedge Fund 3 further profited by approximately $429,672 and $334,869, respectively, due to their timely short positions in FME GY, as that stock's price fell to $64.71 per share, a decrease of approximately 8.94% from the prior trading day's closing price with an increased volume of approximately 518% from the average daily trading volume over the previous four weeks.  These profits resulted from trading on material, nonpublic information about the proposed ESRD rule relating to kidney dialysis that Worrall had given to Blaszczak including through the communications detailed above, and that Blaszczak then transmitted to

Fogel, who caused Adviser A to engage in the transactions.

137.    On July 2, 2013, Fogel emailed Adviser A co-workers, stating: "Credit to d blazcack [sic] on this one.  . . . He deserves to get paid some for this dialysis call. . . let's not get crazy but still.  Way more valuable than the other dc clowns put together I think." An Adviser A trader wrote to Fogel, "Obviously Blazcack [sic] was your crutch."

138.    The next day, an Adviser A employee emailed Blaszczak agreeing to pay his firm "the amount you suggested ($100K) . . . ."

### 3.    CMS Announcement Number 3:  November 22, 2013 ESRD Rule (Trading in DVA)

139.    The insider trading scheme, including the ways in which Worrall accessed CMS's confidential information, how Worrall passed the information to Blaszczak, and how Blaszczak passed the information to Huber and/or Fogel worked in the same manner with respect to the final ESRD rule relating to kidney dialysis.

140.    On November 22, 2013, after the market closed, CMS announced the final ESRD rule.  The final rule maintained the 12% cut to the ESRD base rate that was announced on July 1.  However, unlike the July announcement, CMS announced that this reduction would be phased in over the course of three to four years.  As a result, kidney dialysis facilities would experience no impact to overall payments in 2014.  This decision was highly confidential and was not intended to be disclosed before CMS publicly announced it on November 22.

141.    On July 31, 2013, after CMS announced the proposed ESRD rule described above, Blaszczak emailed Fogel, "I am all over [another pending rule] and ESRD.  I'm trying to focus the most attention on stuff that can move the needle the most."

142.    Throughout July, August, and September 2013, Worrall continued to attend bi-weekly ESRD monitoring meetings and corresponded with CMS staff who were working on the

final ESRD rule.  These communications included discussions of the drug utilization rates for ESRD-related drugs.  Upon information and belief, by virtue of his position and communications with other CMS employees identified above and below, Worrall obtained material, nonpublic information about the final ESRD rule in the summer and fall of 2013.

143.    Worrall and Blaszczak met in Washington, D.C. on August 6, 2013.

144.    Upon information and belief, Worrall tipped Blaszczak material information about the final ESRD rule while it was still nonpublic.

145.    On August 26, 2013, Blaszczak emailed Fogel, stating, "Looks like a phase in of 3 or 4 years" for the rebase cut announced in the preliminary ESRD Rule.  Blaszczak said, "The cut really shouldn't change much at all – but phased in.  This is what cms wanted all along." Fogel replied, "Thanks keep me posted, hugely interested in final outcome."

146.    On September 5, 2013, Worrall and Blaszczak spoke on the telephone.

147.    On September 18, 2013, Blaszczak circulated a research note to clients, including Fogel and others at Adviser A.  The note, which clients accessed by logging in with a password to ADVI's web portal, stated, "We have a non-consensus view on what CMS is likely to do regarding the ESRD CY 2014 final rule."  The note added, "we think chances are likely" that CMS finalizes approximately the same reimbursement rate as the proposed rule (12%), and "we think a 3-4 [year] phase-in is more likely" than no phase-in at all.

148.    On September 23, 2013, a CMS staff member who was working on the final ESRD rule shared with four colleagues who also were working on the rule a memo about the prospective impact of the 12% reimbursement cut on the dialysis community and options for implementing it through a transition period.  Among other things, the memo noted that implementing the 12% cut without a transition period raised "the potential of facility closures,

specifically SDOs [small dialysis organizations] and rural facilities, which may lead to a decline in beneficiary access to care." The memo discussed a possible 3 or 4 year phase-in of the reimbursement cut.

149.    Later that day, a CMS employee who reported directly to Worrall signed Blaszczak into CMS.

150.    Worrall and Blaszczak communicated through texts and calls several times during the last week of September 2013. Blaszczak exchanged several calls with Adviser A in mid-October 2013.

151.    On November 4, 2013, following a meeting involving senior staff and the Secretary of Health and Human Services, CMS staff working on the final ESRD rule were told that the phase-in period should not be longer than four years. The next day, CMS staff working on the final ESRD rule reviewed a confidential draft briefing paper stating that the drug utilization reduction would be $29.93 (very close to the $29.52 or 12% cut in the proposed ESRD rule from July 2013). It also stated, "we are implementing a 4-year transition of the drug utilization reduction . . . to create an overall zero percent impact for all ESRD facilities from the previous year's payments for CYs 2014 and 2015." Each page of the draft briefing paper displayed warnings that the information was privileged and confidential.

152.    On November 6, 2013, from 1:00 p.m. to 2:00 p.m., Worrall attended the bi-weekly ESRD monitoring meeting. Several CMS staff who sent or received the confidential memos on September 23 and November 5 and who were working on the final ESRD rule attended the meeting.

153.    On November 6, 2013, at 3:42 p.m., CMS circulated a confidential briefing paper to the CM Director and staff in the Director's Office concerning the final ESRD rule. As in the

draft circulated on November 5, the November 6 briefing paper proposed finalizing the drug

utilization reduction at $29.93 per treatment and establishing a four-year transition of the

reduction.  The briefing paper stated that the four-year transition would cause the reduction per

treatment to have an overall flat impact for ESRD facilities in 2014 and 2015.  Each page of the

briefing paper displayed warnings that the information was privileged and confidential.

154.     The confidential briefing paper included an impact analysis for 2014 that used

2012 ESRD claims distribution data to show the impacts of a number of factors including the

ESRD payment rate update.  Upon information and belief, Worrall learned of the information

conveyed in the briefing papers while it was still nonpublic.

155.     After the briefing paper was circulated on November 6, 2013, Blaszczak and

Worrall exchanged several text messages.  November 6, 11, and 12 were the only three days they

communicated by text that month.

156.     On November 15, 2013, Blaszczak visited Worrall at CMS.

157.     Upon information and belief, Worrall tipped Blaszczak material information

about the phase-in for the final ESRD rule while it was still nonpublic.

158.     Later that day, Blaszczak tipped the information that he received from Worrall to

Fogel.  Blaszczak emailed Fogel stating, "Dialysis very close to same cut in the proposed [rule]

but phased in over 4 years."  As demonstrated below, the market viewed the four-year transition

as a positive development for the affected companies.  Blaszczak's and Fogel's emails

continued, with Blaszczak providing more specific information to Fogel:

> Fogel:  Oh wow u think 4 yrs vs 2-3? Haven't heard the 4. So you [sic] $29 cut
> becomes like $25 over 4 years or $20 or 27?  You confident in t[h]e 4 years?
>
> Blaszczak:  Its 3 or 4. . . . I think since they won't budge on a cut number – they
> give in and make it 4.  The[] debate has been 3 or 4.

> Fogel: [W]hat about the cut $25, $27, $23?
>
> Blaszczak: If they go 4 year phase in the cut will be $29.

Blaszczak went on to add regarding the 4-year phase-in:

> Put yourself in their shoes. All they have been hearing about is small rural dialysis facilities that will go out of business. They are very worried about this. . . . Phase in eases some concerns over big impact to small dialysis facilities - even though the impact is likely exaggerated.

159.    On Sunday, November 17, 2013, Blaszczak emailed Fogel that the dialysis rule could come out on Friday, November 22. Blaszczak added, "This regulation is by far the most politically charged out of all the regulations about to be released. Key issues in this regulation will be debated till the very end and therefore very volatile as some issues won't be fully agreed upon till right up to publication."

160.    On November 18, 2013, Fogel forwarded Blaszczak's email from November 15 (regarding the four year transition) internally at Adviser A and commented about the impact on the stock price of DVA if CMS implemented a $29 cut over four years, stating, "I think the stock never looks back."

161.    On the morning of November 22, 2013, at a morning meeting, Adviser A personnel discussed DVA and another kidney dialysis stock, with notes from the meeting stating, "[m]arket is pricing a cut from 29 to 23 that is phased in over 3 years." Shortly thereafter, Fogel emailed Adviser A personnel regarding the ESRD rule and advised that the "[m]ost likely scenario is a full $29 cut phased in over 3 years (could be some slight relief or 4 yrs) . . . ." Fogel recommended purchasing shares of DVA and suggested shorting a smaller amount of the other stock as a hedge to manage the risk around the ESRD rule.

162.    Later on November 22, 2013, Adviser A placed orders for Hedge Fund 1 and Hedge Fund 3 to buy a total of 200,000 shares of DVA and sold short a smaller amount of the

other kidney dialysis stock.  Fogel had advocated for an even larger purchase of DVA shares. These transactions were based on the material, nonpublic information about the ESRD rule that Worrall had given to Blaszczak, and that Blaszczak then transmitted to Fogel, who caused Adviser A to engage in the transactions, all as described above.

163.    Later that afternoon, Blaszczak issued his "final thoughts" on the upcoming final ESRD rule in a research note circulated to clients.  Blaszczak wrote, "We think the rebase cut is likely very close to the proposed 12% (likely between 11 to 12+% in the final).  The reason being the data supports the size of cut.  In fact, we think the drop in utilization of [ESRD-related drugs] continues to decline after the proposed rule.  We also think there will be a phase-in of 3-4 years of the rebase cut (we lean slightly towards a 4-year phase in over 3 if we had to pick)."

164.    At approximately 4:00 p.m. on November 22, 2013, CMS released the final ESRD rule with a drug utilization cut of $29.93, phased in over three to four years.

165.    On the evening of November 22, 2013, Fogel touted Blaszczak's accurate information in internal emails stating: "I told you guys blazcack [sic] is the man," "he has crushed it on these rules both times round," and "Blazcack [sic] dead on again.  He is the only one who has a clue."  Fogel also emailed Blaszczak, "Great call on all fronts DB."

166.    On November 25, 2013, the following trading day after CMS publicly released the final ESRD rule, DVA closed at $61.55 per share, an increase of approximately 8.86% over the prior day's closing price with an increased trading volume of approximately 294% from the average daily trading volume over the previous four weeks.  As of November 25, 2013, Hedge Fund 1 and Hedge Fund 3 profited by approximately $569,302 and $445,497, respectively, from their timely DVA trading.  These profits resulted from the material, nonpublic information about the final ESRD rule relating to kidney dialysis, which Worrall had given to Blaszczak including

through the communications detailed above, and that Blaszczak then transmitted to Fogel, who

caused Adviser A to engage in the transactions described above.

## FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
(Against Defendants Worrall (CMS Announcement Numbers 1 through 3), Blaszczak
(CMS Announcement Numbers 1 through 3), Fogel (CMS Announcement Numbers 1
through 3), and Huber (CMS Announcement Number 1)**

167. The Commission re-alleges and incorporates by reference each and every

allegation in paragraphs 1 through 166, inclusive, as if fully set forth herein.

168. With respect to the trading preceding each CMS announcement described above,

Defendants Worrall (with regard to CMS Announcement Numbers 1 through 3), Blaszczak (with

regard to CMS Announcement Numbers 1 through 3), Fogel (with regard to CMS

Announcement Numbers 1 through 3), and Huber (with regard to CMS Announcement Number

1), with scienter, by use of the means or instrumentalities of interstate commerce or of the mails,

in connection with the purchase or sale of securities, directly or indirectly:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and/or

(c)     engaged in acts, practices or courses of business which operated or would

operate as a fraud or deceit upon any person.

By reason of the actions alleged herein, Defendants Worrall, Blaszczak, Fogel, and Huber

violated  Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17

C.F.R.§ 240.10b-5*] and unless restrained and enjoined will continue to do so.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a)(1)
**(Against Defendants Worrall (CMS Announcement Numbers 1 and 2), Blaszczak (CMS Announcement Numbers 1 and 2), Fogel (CMS Announcement Numbers 1 and 2) and Huber (CMS Announcement Number 1)**

169.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 168, inclusive, as if fully set forth herein.

170.    With respect to the trading preceding CMS announcements described above affecting issuers VAR, EKTAB, FMS, and FME GY, Defendants Worrall (with regard to CMS Announcement Numbers 1 and 2), Blaszczak (with regard to CMS Announcement Numbers 1 and 2), Fogel (with regard to CMS Announcement Numbers 1 and 2), and Huber (with regard to CMS Announcement Number 1), by use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities, directly or indirectly, with scienter, employed devices, schemes, or artifices to defraud.

171.    By reason of the actions alleged herein, Defendants Worrall, Blaszczak, Fogel, and Huber violated  Section 17(a)(1) of the Securities Act [*15 U.S.C. § 77q(a)(1)*] and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter Final Judgments:

### I.

Finding that Defendants Blaszczak, Worrall, Huber, and Fogel violated the provisions of the federal securities laws as alleged herein;

### II.

Permanently restraining and enjoining Defendants Blaszczak, Worrall, Huber, and Fogel

from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*], Section 17(a)(1) of the Securities Act [*15 U.S.C. § 77q(a)(1)*];

## III.

Ordering Defendants Blaszczak, Worrall, Huber, and Fogel to jointly and severally disgorge, with prejudgment interest, all illicit trading profits, avoided losses, or other ill-gotten gains received by any person or entity, including but not limited to all direct and indirect tippees, as a result of the actions alleged herein;

## IV.

Ordering Defendants Blaszczak, Worrall. Huber, and Fogel  to pay civil penalties pursuant to Section 21A of the Exchange Act [*15 U.S.C. § 78u-1*]; and

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

## JURY DEMAND

The Commission demands trial by jury.

Dated: May 24, 2017                                    Respectfully submitted,


                                                       Robert A. Cohen
                                                       Gregory Bockin*
                                                       A. Kristina Littman*
                                                       Ann Rosenfield*
                                                       Carolyn M. Welshhans*


                                                       U.S. Securities and Exchange Commission
                                                       100 F. Street, N.E.
                                                       Washington, D.C.  20549
                                                       Tel:  (202) 551-7378 (Littman)
                                                       Tel:  (202) 551-5684 (Bockin)
                                                       Email:  LittmanAK@sec.gov
                                                       Email: BockinG@sec.gov

*Of Counsel:*

Cheryl Crumpton*

*Not admitted in the Southern District of New York